UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

BRENDA GERMAN,                    :
                                  :
          Plaintiff               :     No. 4:11-CV-00715
                                  :
     vs.                          :     (Judge Nealon)
                                  :
MICHAEL J. ASTRUE,                :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :          **FILED**
                                  :        **SCRANTON**
          Defendant               :
                                         AUG 3 1 2012
                **MEMORANDUM**
                                  PER ___ *M. δ. P.* ___
                                         **DEPUTY CLERK**

**BACKGROUND**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Brenda German's claim for social security

disability insurance benefits.

        German protectively filed[1] her application for disability

insurance benefits on July 18, 2008. Tr. 11, 74, 89-93 and 105.[2]

The application was initially denied by the Bureau of Disability

Determination on October 24, 2008.[3]  Tr. 11 and 76-

_____

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of her Answer on June 22,
2011.

3.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security

                                              (continued...)

80.  On December 10, 2008, German requested a hearing before an administrative law judge. Tr. 11 and 85-86.  After about 13 months had elapsed a hearing was held before an administrative law judge on January 11, 2010. Tr. 23-50.  On January 27, 2010, the administrative law judge issued a decision denying German's application. Tr. 11-19.  On March 18, 2010, German filed a request for review with the Appeals Council, and after about 11 months had passed, the Appeals Council on February 9, 2011, concluded that there was no basis upon which to grant German's request for review. Tr. 1-7.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

German then filed a complaint in this court on April 13, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on November 3, 2011, when German filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that German meets the insured status requirements of the

---

3.  (...continued)
Administration.   Tr. 77.

4.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."   M.D.Pa. Local Rule 83.40.1.

Social Security Act through December 31, 2012. Tr. 11, 13, 95 and 105.

German, who was born in the United States on May 4, 1961,[5] withdrew from school after completing the 8th grade and at a later unspecified date obtained a General Equivalency Diploma. Tr.89, 94 and 362. German, during her elementary and secondary schooling, attended regular education classes and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 108, 115 and 146.  After obtaining a GED, German completed two years of college and "receiv[ed] a diploma for her efforts" in computer administration in 2002. Tr. 115 and 362-363.

German has past relevant work experience[6] as (1) a production machine operator described as semi-skilled, medium work by a vocational expert; (2) a shipping/receiving person involving picking/packing orders described as unskilled, medium work; and (3)

---

5.  At the time of the administrative hearing and the administrative law judge's decision Moyer was 48 years of age. Tr. 45.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). German is considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c).

6.  Past relevant employment in the present case means work performed by German during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

a delivery/warehouse person described as semi-skilled, medium

work.[7] Tr. 45-46.

---

7.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

> (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

The records of the Social Security Administration reveal that German had earnings in the years 1974, 1977 through 1980, 1983, 1984, 1988, 1989, and 1991 through 2007. Tr. 96. German's total earnings during those years were $242,022.82. Id.  From 1993 through 2007 (a fifteen-year period) German's earnings ranged from a low of $1263.00 in 2002 to a high of $41,973.51 in 1998. Id. From 2003 through 2007 German's earnings were $9761.83, $16,654.16, $20,267.38, $10,583.91 and $4427.41, respectively. Id.

German claims that she became disabled on April 23, 2007, because of chronic obstructive pulmonary disease (COPD), a history of a surgically repaired brain aneurysm, a seizure disorder, migraine headaches, a left wrist disorder,[8] and a cognitive disorder, depressive disorder and anxiety disorder. Tr. 109; Doc. 18, Plaintiff's Brief, p. 2. German also claims that she suffers from medication side effects, including drowsiness. Id.  German has not worked since April 23, 2007. Id.  German's last position was from March 2, 2005, to April 23, 2007, as a shipping/receiving person for Blue Mountain Machine, Inc., Tr. 110. This position as stated above was described as unskilled, medium work. With respect to that position, German stated that she worked 8 hours per day, 5 days per week. Id.  Although German claims that she has been disabled and unable to work since April 23, 2007, the record reveals that German applied for and received unemployment

---

8. German is right-handed. Tr. 148.

5

compensation benefits during the first and second quarters of 2008
in the amounts of $2142.00 and $1377.00, respectively.[9] Tr. 103.

For the reasons set forth below, we will affirm the
decision of the Commissioner denying German's application for
disability insurance benefits.

## STANDARD OF REVIEW AND SEQUENTIAL EVALUATION PROCESS

Under 42 U.S.C. § 405(g) and relevant case law, the
court is limited to reviewing the administrative record to
determine whether the decision of the Commissioner is supported by
substantial evidence. Counsel for the parties are familiar with
the five-step sequential evaluation process that the Commissioner
utilizes and the substantial evidence standard of review.[10]

---

9. An individual can only collect unemployment compensation if
the individual is able and willing to accept work. 43 P.S.
§801(d)(1). The fact that German collected unemployment
compensation after her alleged disability onset date of April 23,
2007, suggests that she represented when applying for such
benefits that she was able and willing to accept employment.

10. Substantial evidence "does not mean a large or considerable
amount of evidence, but 'rather such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999). Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213. In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).
Substantial evidence exists only "in relationship to
(continued...)

## MEDICAL RECORDS AND OTHER EVIDENCE

Before we address the administrative law judge's decision and the arguments of counsel, we will briefly review some of German's activities and medical records.

The record reveals that German lives with her husband and daughter who at the time of the administrative hearing was 10 years old. Tr. 36 and 143.  German's daughter was home-schooled. Id. German's husband works full-time during the day and helps with his daughter's schooling in the evening. Tr. 37. German prepares meals for her daughter. Tr. 144.  German stated that she has no problems with personal care other than she "cannot wear button pants or

_____

10.  (...continued)
all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).
The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.

blouses," "cannot bathe quickly," "cannot wash my hair fast" and
"do[esn't] shave." Id.  German is able to perform cleaning and
laundry. Tr. 145.  German stated that she reads books and watches
TV and that she engages in those activities everyday. Tr. 147.
German, when given an opportunity to do so, noted no problem with
standing, walking, sitting, kneeling, talking, hearing, stair
climbing, understanding and following instructions. Tr. 148.

     As stated above, German's alleged disability onset date
is April 23, 2007, therefore, we will primarily focus on medical
treatment received on and after that date.

     Prior to the alleged disability onset date, German had
treatment for various ailments including migraine headaches,
sinusitis, anxiety and depression. Tr. 166-183 and 249-263.
German's primary care physician was Deborah A. Smith, M.D., a
family practitioner, who began treating and prescribing medication
for German in January, 2006.[11] Tr. 249-263.  In August 2006, German
underwent brain surgery to correct an aneurysm. Tr. 176-183. She
recovered from the surgery and returned to work on or about
December 4, 2006, and continued to work as a shipping/receiving
person until late April, 2007.  Tr. 96, 102, 109-110 and 169.
German told Dr. Smith at an appointment on May 9, 2007, that she
had been "permanently laid off from her job," that her "[l]ast
migraine was 1-2 months ago," that the "Lexapro was working great

---

11. As stated earlier, German in the year 2006 was engaged in
unskilled, medium work full-time as a shipping/receiving person.

up until the stress from the loss of her job," and that she planned to find another job where she could work with computers instead of machines. Tr. 267. In August 2007, German told Dr. Smith that she was having difficulty finding work because of her 20 pound weight limit restriction. Tr. 272.

Dr. Smith continued to treat German periodically through December 2009 for migraine headaches, anxiety, depression, shortness of breath, tobacco abuse, left wrist pain and a seizure disorder.  Tr. 265-280 and 407-419.  German was also treated for left wrist pain in 2007 and 2008. Tr. 201-207, 210-214, 216-227, 239-240, 272, 274, 277-279 and 320-326.

The record reveals that, from the age of 9, German was smoking from 1 to 4 packs of cigarettes per day. Tr. 29, 258, 268, 279 and 395.  On January 23, 2006,German was smoking 2 to 3 packs per day; on August 8, 2006, 1 pack per day; on May 22, 2007, 3 packs per day; on July 8, 2008, 2 to 3 packs per day; and on December 10, 2009, 2 packs per day. Id.  At the administrative hearing in January, 2010, German testified that she cut down her smoking from 4 packs per day to 1 pack per day. Tr. 29. Even with this excessive smoking, a stress test revealed that she had fair aerobic capacity and when examined by Richard Rothfleisch, M.D., a pulmonary specialist, on November 25, 2009, she denied having any headaches or history of stroke or seizures. Tr. 395 and 403.

With respect to German's problems with her left wrist, it appears that she was treated primarily by two physicians, Robert B.

Grob, D.O., and Lawrence E. Weis, M.D., during the years 2007 and 2008.

The first appointment with Dr. Grob appears to have occurred on February 23, 2007. Tr. 206-207. At that appointment, German told Dr. Grob's physician's assistant that "while at work on the 20th of February she was carrying some boxes when she tripped over a pallet" and injured her wrist. Tr. 206. German went to the emergency department and X-rays were taken. Id.  German was told by emergency department personnel that she had a sprain. Id.  Upon questioning by the physician's assistant at Dr. Grob's office, German denied that she had swelling, numbness and tingling. Id.  German admitted that she smoked 2 packs of cigarettes per day. Id.  The results of a physical examination were essentially normal other than decreased range of motion in the left wrist secondary to pain and tenderness "over the distal aspect of the radius and ulna."[12] Id. German had no ecchymosis (bruising) and she was able to make a fist and fully extend her fingers. Id.  X-rays of the left wrist revealed no acute fracture or dislocation. Id.  The assessment was that German suffered a contusion of the wrist. Id.  Subsequent records from March and April, 2007, reveal that German had an MRI of the left wrist which was normal except for "some benign ganglion cysts."[13] Tr. 204-205 and 208-209.

---

12.  The radius and ulna are the two bones of the lower arm.  The distal portion would be that area closest to the wrist.

13.  "Ganglion cysts are noncancerous fluid-filled lumps (cysts)
(continued...)

10

Dr. Grob's physical examination of German on May 18, 2007, revealed that German's "left upper extremity [was] neurovascularly intact." Tr. 202.  He further stated that she had a negative Tinel's sign,[14] no triggering of the fingers, and no tendon or ligament dysfunction. Id.  Dr. Grob merely noted that German had "tenderness along the dorsal tendons, especially the first dorsal compartment." Id.  Dr. Grob's assessment was that German suffered from tendinitis of the left wrist and prescribed the drug Celebrex. Id.  German had a second MRI on June 25, 2007, which revealed "no significant interval change." Tr. 235. The notes of an appointment with Dr. Grob on July 12, 2007, are unremarkable. Tr. 201.  German had a bone scan on July 14, 2007,  of the left wrist which revealed

---

13.   (...continued)
that most commonly develop along the tendons or joints of your wrists or hands. They may also appear in your feet. . . In many cases, ganglion cysts will cause you no pain and require no treatment. Often they go away on their own. When you do need treatment for a ganglion cyst – due to pain or interference with joint movement or for cosmetic concerns – it usually consists of removing the fluid from the ganglion cyst or surgically removing the cyst."  Ganglion cysts, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/ganglion-cysts/DS00767 (Last accessed August 28, 2012).

14.   A positive Tinel's sign suggests an irritated nerve. It is a test for carpal tunnel syndrome. Carpal Tunnel Syndrome, About.com Orthopedics, http://orthopedics.about.com/ cs/carpaltunnel/a/carpaltunnel_2.htm (Last accessed August 28, 2012).

"[n]o scintigraphic evidence[15] of an acute fracture[.]" Tr. 232. Dr. Grob sent German to a specialist for a second opinion. Tr. 201.

On July 20, 2007, German had an appointment with Dr. Weiss, the orthopedic specialist. Tr. 224-225.  At the time of this appointment German was smoking 1 pack of cigarettes per day. Tr. 224.  A physical examination of German revealed full range of motion bilaterally of the cervical spine, shoulders, elbows, wrists and fingers and thumbs; German had normal (5/5) strength in the upper extremities; German had normal reflexes, radial pulses and her sensation was grossly intact. Tr. 225. Dr. Weiss noted some "nonspecific" tenderness "over the volar and dorsal aspects of the left wrist particularly radially." Id.  Several physical tests of the wrist were either negative or equivocal. Id.  Dr. Weis noted: "I can't state that I palpate an obvious ganglion cyst." Id.

German had appointments with Dr. Weis on August 9, 2007, and had an EMG/Nerve Conduction study performed on August 27, 2007. Tr, 222-223.  The notes of the August 9th appointment only reveal that German had "nonspecific discomfort about the wrist" and that

_____

15.  Scintigraphy is defined as "the production of two-dimensional images of the distribution of radioactivity in tissues after the internal administration of a radionuclide, the images being obtained by a scintillation camera." Dorland's Illustrated Medical Dictionary, 1678 (32nd Ed. 2012).

German was scheduled to have an EMG/Nerve Conduction study[16] performed. Tr. 223.  The results of the EMG/Nerve Conduction study were normal. Tr. 222.  There was "no electrophysiologic evidence of carpal tunnel syndrome, cervical radiculopathy or other peripheral neuropathy." Id.

German had an appointment with Dr. Weiss on September 6, 2007. Tr. 221.  A physical examination of German's wrist revealed "tenderness, pain and discomfort over the dorsal aspect of [German's] wrist."  However, the range of motion was normal. Id. Dr. Weiss ordered a repeat MRI which was performed on October 8, 2007, and revealed no abnormality other than the ganglion cysts. Tr. 228. German had additional appointments with Dr. Weiss on October 11, November 9, December 27, 2007, and February 14 and March 28, 2008. Tr. 216-220.  At the appointments on October 11 and December 27, 2007, and February 14 and March 28, 2008, Dr. Weiss's assessment was "left wrist pain, unexplained." Id.  The physical examination on March 28, 2008, revealed "full wrist range of motion" and "[f]ull digital range of motion . . . similar in

---

16.  "Electromyography (EMG) is a test that checks the health of the muscles and the nerves that control the muscles." Electromyography, MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (Last accessed August 28, 2012). A nerve conduction study is a test of the speed of signals through a nerve.  http://www.nlm.nih.gov /medlineplus/ency/article/003927.htm (Last accessed August 28, 2012).

comparison to previous." Tr. 216.  Dr. Weiss recommended "[n]o additional care." Id.

On September 25, 2008, Theodore C. Waldron, D.O., reviewed German's medical records on behalf of the Bureau of Disability Determination and concluded that German had the medically determinable impairments of COPD, seizures, history of a brain aneurysm, headaches and left wrist problems. Tr. 351. Dr. Waldron stated that German had surgery for the brain aneurysm in 2006 and did have some subsequent syncopal episodes (fainting) and an abnormal EEG.[17] Id.  Dr. Waldron stated that German had a normal stress test in July, 2008. Id.

Even in light of German's medical condition, Dr. Waldron concluded that German could engage in a limited range of light

---

17. "EEG" is an abbreviation for electroencephalogram. An EEG is a diagnostic device that measures and records the electrical activity of the brain.  In German's case the EEG was abnormal because of the "presence of intermittent left anterior and mid temporal sharp wave as well as theta range activity" but "[n]o runs of spike and waive activity were seen." Tr. 305.  It was further stated that "[i]n appropriate clinical set up, this can represent epileptic focus" but "[c]linical correlation [was] recommended." Id.  German was prescribed Dilantin, an anti-epileptic drug. Our review of the record does not reveal that any treating or examining physician diagnosed German as suffering from epilepsy. "Epilepsy is a brain disorder in which a person has repeated seizures (convulsions) over time. Seizures are episodes of disturbed brain activity that cause changes in attention or behavior." Epilepsy, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www. ncbi.nlm.nih.gov/pubmedhealth/PMH0001714/ (Last accessed August 28, 2012).

work. Tr. 346-351. Dr. Waldron stated that German could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday and had the ability to push and pull to the degree that she could lift and carry. Tr. 347. Dr. Waldron found that German could occasionally balance, stoop, kneel, crouch and crawl and occasionally use ramps and climb stairs but that she could never climb ladders, ropes or scaffolds. Tr. 348. Dr. Waldron found that German had no manipulative, visual or communicative limitations but that she should avoid concentrated exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards (such as machinery and heights), and  extreme cold and heat. Tr. 348-349.

On November 2, 2008, Dr. Smith completed a questionnaire regarding German's allegations of memory and concentration problems. Tr. 386-387.  Dr. Smith stated that German was diagnosed with anxiety but that she had not referred German to a mental health professional. Tr. 386. Dr. Smith stated that German was alert and oriented, kept appointments as scheduled, and interacted appropriately with office staff. Id.  According to Dr. Smith, German had no problems with short term memory, visual-spatial tasks, comprehension, speech, word finding and calculation. Id. Dr. Smith stated that German had problems concentrating, but had no difficulties performing activities of daily living (e.g., shopping,

15

cooking, cleaning, maintaining a residence, paying bills, personal care, health and hygiene) on a sustained basis and she was not aware of any difficulties with social functioning. Tr. 387.

A review of the medical records reveals sporadic reports by German of seizure or syncope (fainting) episodes. In June, 2008, German reported to Dr. Smith "in passing" that she had two episodes of syncope "over the last couple of weeks.". Tr. 278. German noted that the one episode occurred the "afternoon after she received an anterior spinal injection[.]" Id. On November 4, 2008, German reported having one seizure the night before. Tr. 408. German stated that she had been symptom free until then. Id. Dr. Smith adjusted German's medication. Id. On November 17, 2008, German, when questioned by Dr. Smith, denied any further seizures. Tr. 409. German also reported her headaches were "fairly well controlled[.]" Id.

On February 12, 2009, German reported having three seizures "in the last week." Tr. 410. In April, 2009, German was restarted on Dilantin, in addition to Tegretol, to offset any seizure activity, but no specific seizures were reported. Tr. 412. The next report of seizure activity was not until July 21, 2009, when German recalled having only one seizure three weeks earlier. Tr. 413. German did not report any further seizure activity until November, 2009. Tr. 417-418. No seizure activity was reported in December, 2009. Tr. 419.

16

On October 8, 2008, German was evaluated by David J. Smock, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 362-367.   During this one-time evaluation, German complained of constant depression, extreme distress, and anxiety about herself and others being harmed.   Tr. 363-365. According to Dr. Smock, German's attention and concentration as well as her remote memory showed some impairment. Tr. 365.   Dr. Smock diagnosed German as having a depressive, anxiety and cognitive disorder, and a possible psychotic disorder that needed to be ruled out.   Dr. Smock found that German had "extreme" limitations in every area of mental functioning, except two where he found she had moderate limitations. Tr. 358.   Dr. Smock found that she had extreme limitations in her ability to understand and remember detailed instructions; carry out detailed instructions; make judgment on simple work-related decisions; interact appropriately with the public, supervisors, and coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. Tr. 358. Even though Dr. Smock found that she had these multiple extreme limitations, he found that she could manage benefits in her own best interest. Tr. 359.

On October 16, 2008, Anthony Galdieri, Ph.D., a state agency psychologist, reviewed German's medical records and the report of Dr. Smock and concluded that German suffered from a

cognitive disorder, a depressive disorder, and an anxiety disorder but that these conditions singly and in combination did not meet the criteria of a listed mental impairment. Tr. 369-380.  Dr. Galdieri evaluated 20 areas of mental functioning and found that German was not significantly limited in all but four areas. Tr. 382-383.  Dr. Galdieri concluded that German was moderately limited in her ability to (1) carry out detailed instructions; (2) interact appropriately with the general public; (3) accept instructions and respond appropriately to criticism from supervisors; and (4) travel in unfamiliar places or use public transportation. <u>Id.</u>  Dr. Galdieri concluded that German was able to meet the basic mental demands of competitive work on sustained basis despite the limitations resulting from her impairments. Tr. 384.


## DISCUSSION

The administrative law judge, at step one of the sequential evaluation process, found that German had not engaged in substantial gainful work activity since April 23, 2007, the alleged disability onset date. Tr. 13.

At step two of the sequential evaluation process, the administrative law judge found that German had the following severe impairments: "chronic obstructive pulmonary disease, seizures, status post brain aneurysm, headaches, cognitive disorder, not

18

otherwise specified, depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified." Id. The administrative law judge specifically noted that "[t]hese impairments have more than a minimal impact on the claimant's ability to perform some work-related activities, and therefore, they are severe."[18] Id.

At step three of the sequential evaluation process, the administrative law judge found that German's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13-14. In making this determination, the administrative law judge specifically reviewed Listing 3.00 et seq. (Respiratory Disorders), Listing 11.00 et seq. (Neurological Disorders) and Listing 12.00 et seq. (Mental Disorders).

At step four of the sequential evaluation process, the administrative law judge found that German could not perform her past relevant unskilled to semi-skilled, medium work but that she had the residual functional capacity to perform a limited range of

---

18. An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities.  20 C.F.R. §§ 404.1521 and 416.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id.   An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work.  20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

unskilled, sedentary work. Tr. 14-17.  Specifically, the
administrative law judge found that German could perform sedentary
work under the following circumstances:

> The claimant would need to be in a seated posture
> in the performance of the work.  The primary
> restrictions here would be on activities that may be
> particularly strenuous or stress invoking particularly
> with activities such as climbing ladders, scaffolds,
> or ropes, these can only be done on an emergent basis.
> Climbing stairs or ramps would be on an occasional basis
> and they would need to have safety rails. Activities
> such as working in environments where there would be
> either extreme cold or extreme heat as may exacerbate
> breathing would need to be restricted to at best
> moderate. Activities in environments where there may
> be more than moderate presence of respiratory irritants
> such as fumes, odors, dusts or gases or environments
> that are described as poorly ventilated would be
> prohibited and at best moderate exposure would be
> tolerable. Because of the seizure disorder issue the
> individual should not be working in any unprotected
> heights.  From a psychosocial standpoint, due to some
> issues with depression and anxiety, the individual has
> the capacity to perform work that doesn't involve
> frequent, direct, in person contact with members of the
> public and should be within work settings that are not
> prone to frequent changes in the work setting.  The
> individual should not be required to make a great deal
> of independent judgment within the work place. The
> claimant is relegated to informing supervisors or team
> leaders or someone in a position of authority as to
> some irregularity with the work regimen. The work
> activity should be moderate production pace and not a
> high intensity production pace.

Tr. 15.  In setting this residual functional capacity, the
administrative law judge relied on the opinion of Dr. Waldron who
concluded that German could perform light work and the opinion of

Dr. Galdieri who concluded that German had the mental functional ability to engage in competitive work on a sustained basis. Tr. 17. The administrative law judge did not adopt in toto Dr. Waldron's assessment but gave German the benefit of the doubt and reduced her work capacity to the sedentary level.  Also, in arriving at this residual functional capacity, the administrative law judge found that German's statements about her pain and functional limitations were not credible and gave little weight to the findings of Dr. Smock. Tr. 16. The administrative law judge noted that "Dr. Smock [was] not a treating source of the claimant" and Dr. Smock "[was] relying solely and exclusively on one observation made on the day of the consultative examination and not upon objective long term observations and experiences with this individual."[19] Tr. 17.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge, at step five of the sequential evaluation process, found that German could perform unskilled, sedentary work as a visual inspector, assembler, and surveillance system monitor, and that there were a significant number of such jobs in the state and regional economies. Tr. 18-19 and 48.

---

19.  It is important to point out that Dr. Smock was not a treating psychologist and there is no special preference given the opinion of a non-treating psychologist.  The administrative law judge appropriately relied on the opinion of Dr. Galdieri, who reviewed Dr. Smock's report and German's medical records.

21

The administrative record in this case is 521 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an excellent job of reviewing German's medical history and vocational background in his decision. Tr. 11-19.   Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 21, Brief of Defendant.  German argues that the administrative law judge erred by failing to (1) evaluate German's seizure disorder under the listings, and (2) evaluate the side effects of German's medications.  German also contends that the case should be remanded for further proceedings based on new evidence submitted to the Appeals Council. We have thoroughly reviewed the record in this case and find no merit in German's arguments.

German's first argument is premised on the contention that she met the requirements of a certain physical listing, specifically Listing 11.02A, and that the administrative law judged failed to adequately explain why she did not meet that listing. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02A.

The purpose of the Listings of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity," regardless of age, education or work experience. 20 C.F.R. § 404.1525(a); see also Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listings operate as a presumption of disability

without further inquiry as to whether the claimant can actually
perform prior relevant work or other work available in the local,
regional or national economies. Id.  To qualify for benefits by
showing that an impairment, or combination of impairments, is
equivalent to a listed impairment, German had the burden of
presenting "medical findings equivalent in severity to all the
criteria for the one most similar impairment." Sullivan v. Zebley,
493 U.S. at 531; Bowen v. Yuckert, 482 U.S. 137, 146 n.5
(1987)(stating that it is the claimant's burden to present medical
findings that show that his impairment matches or is equal in
severity to a listed impairment).

Listing 11.02A provides in toto as follows: "11.02
Epilepsy - convulsive epilepsy, (grand mal, psychomotor),
documented by detailed description of a typical seizure pattern,
including all associated phenomena; occurring more frequently than
once a month in spite of at least 3 months of prescribed treatment.
With: A. Daytime episodes (loss of consciousness and convulsive
seizures)[.]"

German has not explained how she meets the criteria of
Listing 11.02A.  Her argument is vague and not supported by the
record. It is not at all clear from the medical records that
German's seizures occurred at the requisite level of frequency to
meet or equal this listing. No treating physician diagnosed German
as suffering from epilepsy and there is no statement from a

treating or examining physician that gives a "detailed description
of a typical seizure pattern, including all associated phenomena,
occurring more frequently than once a month in spite of at least 3
months of prescribed treatment" with "[d]aytime episodes (loss of
consciousness and convulsive seizures)."  German's seizure pattern
was sporadic and prescribed treatment varied because of adjustments
in her medications. Tr. 278, 408, 413 and 417-418. It appears there
were times when German went several months without having a
seizure. Furthermore, German did not report any actual seizures
until November 2008, over a year after her alleged disability onset
date and, even then, she only reported one seizure. Tr. 408.
German's syncopal episodes in June 2008 were not characterized as
convulsive seizures. Tr. 278. The only months where German reported
to Dr. Smith that she had more than one seizure were in February
2009 and in November 2009, more than nine months apart. Tr. 410 and
417-418. She reported only one vague seizure in July 2009. Tr. 413.
No specific convulsive seizure episodes were reported in March,
April, May, June, August, September, October, or December, 2009.
Tr. 411-416. Under the circumstances, it was reasonable for the ALJ
to conclude that German's condition did not meet or equal the
criteria of Listing 11.02A.

        The Social Security regulations require that an
applicant for disability insurance benefits come forward with
medical evidence "showing that [the applicant] has an

24

impairment(s) and how severe it is during the time [the applicant]
say[s] [he or she is] disabled" and "showing how [the]
impairment(s) affects [the applicant's] functioning during the
time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. §
404.1512(c).

   No treating or examining physician has indicated that
German suffers from physical or mental functional limitations that
would preclude her from engaging in the limited range of unskilled,
sedentary work set by the administrative law judge in his decision
for the requisite statutory 12 month period.[20]  No physician
indicated that German was incapable of engaging in the limited
range of sedentary work set by the ALJ on a full-time basis.
Furthermore, no treating or examining physician indicated that
German's seizure disorder singly or in combination with her other
impairments met or equal the criteria of any listing.  The
administrative law judge reviewed the listing and gave an adequate
explanation for finding that German did not meet or equal the
criteria of a listed impairment.

   As for German's argument that the ALJ did not consider
the side-effects of her medications, the decision of the ALJ

_____

20.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

specifically addressed that issue.  The administrative law judge

stated as follows:

> [German] indicated that the side effects of the
> medications include tiredness and an inability to
> concentrate.
> After careful consideration of the evidence, the
> undersigned finds that the claimant's medically
> determinable impairments could reasonably be
> expected to cause the alleged symptoms; however,
> the claimant's statement concerning the intensity,
> persistence and limiting effects of these symptoms
> are not credible to the extent they are inconsistent
> with the above residual functional capacity.

Tr. 16.  This statement sufficiently addressed the issue of

medication side-effects.  Moreover, our review of the record

revealed no notations from treating physicians that German

complained of medication side-effects or had adverse reactions to

prescribed medications.

    The administrative law judge was not required to accept

German's claims regarding her physical limitations and the side-

effects of medications.  See Van Horn v. Schweiker, 717 F.2d 871,

873 (3d Cir. 1983)(providing that credibility determinations as to

a claimant's testimony regarding the claimant's limitations are for

the administrative law judge to make).  It is well-established that

"an [administrative law judge's] findings based on the credibility

of the applicant are to be accorded great weight and deference,

particularly since [the administrative law judge] is charged with

the duty of observing a witness's demeanor . . . ."  Walters v.

Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see

also <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799,
801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the
individual optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge observed and
heard German testify, the administrative law judge is the one best
suited to assess her credibility.

Finally, German argues that new and material evidence
requires that the case be remanded to the Commissioner for further
proceedings. After the administrative law judge issued his
decision, German's attorney submitted further evidence to the
Appeals Council. Much of the evidence submitted appears to be
evidence which was presented to the ALJ. In addition, some of the
evidence presented to the Appeals Council relates to treatment and
diagnostic tests German received after the ALJ issued his decision.

Evidence submitted after the administrative law judge's
decision cannot be used to argue that the administrative law
judge's decision is not supported by substantial evidence.
<u>Matthews v. Apfel</u>, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only
purpose for which such evidence can be considered is to determine
whether it provides a basis for remand under sentence 6 of section
405(g), 42 U.S.C.  <u>Szubak v. Secretary of Health and Human Servs.</u>,
745 F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of section
405(g) the evidence must be "new" and "material" and a claimant
must show "good cause" for not having incorporated the evidence

27

into the administrative record. Id.  The Court of Appeals for the
Third Circuit explained that to be material "the new evidence
[must] relate to the time period for which benefits were denied,
and that it not concern evidence of a later-acquired disability or
of the subsequent deterioration of the previously non-disabling
condition." Id.

In the present case, contrary to German's assertion, the
additional evidence that she submitted to the Appeals Council is
not material.  German points to evidence of ongoing treatment for
seizures and a more recent EEG.  However, this evidence does not
relate to the time period adjudicated by the administrative law
judge.  If German believes that her seizure disorder worsened or
deteriorated after the administrative law judge's decision, her
remedy is to file a new claim with the additional evidence, not
seek a sentence six remand under 405(g). As for any evidence that
relates to the time period prior to the ALJ's decision, German has
not demonstrated a "reasonable possibility that the new evidence
would have changed the outcome" and has not demonstrated "good
cause" for not having presented the evidence prior to or during the
administrative hearing.

The administrative law judge relied on the opinions of
Dr. Waldron and Dr. Galdieri. The administrative law judge's
reliance on those opinions was appropriate. See Chandler v.
Commissioner of Soc. Sec.,667 F.3d. 356, 362 (3d Cir.

2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

We are satisfied that the administrative law judge appropriately took into account all of German's mental and physical limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

**United States District Judge**

Dated: August 31, 2012